arose which required the production of the original instrument.

The motion for rehearing is overruled.

---

## Ex parte McCARTY. (No. 9901.)

(Court of Criminal Appeals of Texas. Nov. 18, 1925.)

Criminal law ⟨key⟩1208(9)—Indeterminate sentence law inapplicable to sentence on conviction for robbery, where minimum punishment imposed.

Vernon's Code Cr. Proc. 1916, art. 865a (Code Cr. Proc. 1925, art. 775), relating to indeterminate sentences, has no application to a sentence of five years on a conviction for robbery, since minimum punishment was imposed.

Application for writ of habeas corpus by Street McCarty. Writ denied.

Sam D. Stinson, State's Atty., of Austin, and Nat Gentry, Jr., Asst. State's Atty., of Tyler, for the State.

HAWKINS, J. Relator is confined in the penitentiary under a judgment of the district court of Wichita county condemning him to the penitentiary for five years upon a conviction for the offense of robbery. He seems to think he has been deprived of some rights under the provisions of article 865a. Vernon's C. C. P. (article 775, 1925 Revision), relating to indeterminate sentences, and presents his application to this court praying for writ of habeas corpus.

The minimum punishment for the offense of robbery is confinement in the penitentiary for five years. Relator was awarded the lowest penalty; hence the indeterminate sentence law has no application.

The writ is denied.

---

## HUMBLE OIL & REFINING CO. et al. v. WOODS. (No. 9388.)*

(Court of Civil Appeals of Texas. Dallas. June 20, 1925. Rehearing Denied Nov. 7, 1925.)

1. Appeal and error ⟨key⟩713(3)—Assignments of error, calling in question action of court on special exceptions, will not be considered.

Assignments of error, calling in question action of court on special exceptions, will not be considered, where presented by bills of exceptions only, since fact that exceptions were presented to, and ruled on by, the court must be preserved by a judgment entry and not by a bill of exceptions.

2. Exceptions, bill of ⟨key⟩6—Office of "bill of exceptions" stated.

Office of a "bill of exceptions" is to make a record of proceedings had in course of trial

---

that cannot be properly included in minutes of court in some form of judgment, and is not to be used to supplant or perform service that belongs to making of the record of proceedings had, which are required to be incorporated in minutes of the court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bill of Exceptions.]

**3. Appeal and error ⟨⟩843(1)—Assignments of error not reviewed, where not necessary to propositions that alone must dispose of appeal.**

Assignments of error will not be reviewed, where they will not be of any service in determining propositions that alone must dispose of the appeal.

**4. Appeal and error ⟨⟩1050(1)—Admission of lessee's testimony, that a conditional offer of $750 per acre had been made to him for his mineral lease as evidence of market value thereof, held not prejudicial error.**

·In suit by lessee of mineral rights against owner, for damages for flooding the property, thereby preventing lessee from exploring for minerals, admission of lessee's testimony that a conditional offer of $750 per acre had been made to him for his mineral lease as evidence of its market value *held* not prejudicial error, where it tended to corroborate correctness of his estimate of market value of property as testified to by him, and was not accepted by jury as establishing market value, but only in corroboration of witness' testimony as to such value.

**5. Evidence ⟨⟩543(3)—Witness held qualified to express an opinion as to what market value of plaintiff's mineral lease was, though not knowing of specific sales of such leases.**

Witness *held* qualified to express an opinion as to what market value of plaintiff's mineral lease was, notwithstanding that he was unable to state that he knew of any specific sales of such leases, where he showed that there was a market for mineral leases on land located in immediate vicinity, and that he had a general knowledge of value of such leases.

**6. Evidence ⟨⟩543(3)—Witness qualified to express opinion as to market value of mineral leases without pointing out any specific sale thereof.**

Witness is qualified to express an opinion as to market value of mineral leases, without being able to point out or testify to any specific sale, if it is shown through general discussion with others interested in sale of such property that he has become generally advised as to value thereof.

**7. Appeal and error ⟨⟩1050(1)—Admission of testimony of market value of mineral lease held not prejudicial error.**

In suit by lessee of mineral rights for damages against owner for flooding the property, thereby preventing exploration for minerals, admission of witness' testimony that he tried to buy same property and that owner wanted $300 for it *held* not prejudicial error, where it

tended to corroborate correctness of plaintiff's estimate of market value of such property as testified to by him, and was not accepted by jury as establishing market value, but only in corroboration of plaintiff's testimony as to such value.

**8. Evidence ⟨⟩543(3)—Witness held qualified to testify as to market value of his mineral lease.**

Witness *held* qualified to testify as to market value of his mineral lease, where he had several leases in the vicinity and was dealing in the oil business and leases, and had talked extensively with people who were actively engaged in oil business at that time.

**9. Mines and minerals ⟨⟩73—Evidence held to sustain finding that reasonable market value of plaintiff's lease for oil and gas purposes unobstructed was $100 per acre.**

In suit by lessee of mineral rights against owner for damages from flooding of the property; thereby preventing exploration, evidence *held* to sustain finding that reasonable market value of plaintiff's lease for oil and gas purposes unobstructed was of the value of $100 per acre.

**10. Mines and minerals ⟨⟩73—Evidence held to sustain finding that reasonable market value of lease for oil and gas purposes obstructed was $40 per acre.**

In suit by lessee against owner for damages for permitting property to be covered by water and thereby preventing exploration, evidence *held* to sustain jury's finding that the reasonable market value of plaintiff's lease for oil and gas purposes obstructed was $40 per acre.

**11. Appeal and error ⟨⟩216(2)—Failure of charge to properly submit burden of proof as to amount of damages held not ground for complaint.**

In suit for damages by lessee of mineral rights against owner for permitting property to be covered by water, thereby preventing exploration for minerals, that charge did not properly submit burden of proof as to amount of damages *held* not ground for complaint, where defendants failed to present a special charge properly presenting the law applicable thereto, notwithstanding that they made timely objection to the charge.

**12. Trial ⟨⟩234(7) — Charge on burden of proof held to place on plaintiff burden of proving that defendants prevented him from developing property for oil and gas purposes, and that he was damaged thereby.**

In suit for damages by lessee of mineral rights against owner for permitting property to be covered by water, thereby preventing exploration for minerals, charge on burden of proof *held* to place on plaintiff burden of proving that defendants prevented plaintiff from developing his property for oil and gas purposes, and that he was damaged thereby; court not being required to expressly charge that plaintiff had burden of establishing amount of damages, especially when not requested by proper special charge.

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

13. **Appeal and error ⊚⇒216(3)—Any error in charge on burden of proof not grounds for reversal, where defendant did not attempt to have court correct alleged defect therein.**

Any error in special charge, placing burden of proof on plaintiff to prove that defendants prevented him from developing property for oil and gas purposes, and that he was damaged thereby, *held* not grounds for reversal, in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 1985, where defendants did not attempt, by special charge or requested issue, to have trial court correct alleged defect therein.

14. **Mines and minerals ⊚⇒73—Court not required to direct jury's attention to any particular place in considering question of market value of lease.**

In suit for damages by lessee against owner for permitting property to be flooded with water, thereby preventing exploration, with everybody assuming that inquiry as to market value of leases was confined to immediate vicinity and question of place not having been raised by the evidence nor by the pleadings, court was not required to direct jury's attention to any particular place in considering question of market value.

15. **Mines and minerals ⊚⇒73—Evidence of market value of mineral lease properly before jury, without reference to location of market or particular oil field of which lease formed a part.**

In suit for damages by lessee of mineral rights against owner of property for permitting it to be flooded by water, thereby preventing exploration for minerals, evidence of market value of leases was properly before jury without reference to location of market or particular oil field of which lease formed a part, and without reference to location or distance from market, where everybody considered that inquiry was confined to market value of leases in immediate vicinity of plaintiff's lease.

16. **Mines and minerals ⊚⇒73—Lease authorizing lessee to explore land held breached by flooding and obstructing of property, though exploration not effected.**

Lease authorizing lessee to explore property for oil, gas and other minerals *held* breached by act of owner in flooding and obstructing property, notwithstanding that such obstructions would not prevent lessee from exploring for minerals, where lease contemplated no such obstructions, and contemplated lessee's right to handle property as an investment, and a recognition that such lease had a commercial value other than a value depending upon result of development.

17. **Mines and minerals ⊚⇒73 — Measure of damages for obstruction of lease to explore lands stated.**

In suit for damages by lessee of mineral rights against owner for permitting property to be covered with water, thereby preventing exploration for gas, oil, and other minerals, measure of damages was difference between reasonable market value of lease for any lawful purpose to which lessee might put it immediately before obstruction and such value immediately thereafter.

18. **Mines and minerals ⊚⇒73—Lease authorizing lessee to explore land construed.**

Under lease authorizing lessee to explore property for minerals, lessee had right to use surface for mining purposes and right to dispose of his property as an article of commerce by barter, sale, or exchange.

19. **Mines and minerals ⊚⇒73—Mineral lease, even in undeveloped territory, has ascertainable value.**

A mineral lease, even in undeveloped territory, is recognized by law as being property of ascertainable marketable value.

20. **Mines and minerals ⊚⇒73—Value of lease may be predicated on production and value of minerals or market value of lease as an article of commerce.**

In action for damages to a mineral lease, value may be predicated for ascertaining measure of recovery, on the production and value of minerals, or the value of the mineral lease as an article of commerce, since existence of a mineral lease creates a property right, though lease conveys no actual interest in the land, but only a right to use it for a certain purpose.

Looney, J., dissenting.

Appeal from District Court, Navarro County; Hawkins Scarborough, Judge.

Action by L. J. Woods against the Humble Oil & Refining Company and others. Judgment for plaintiff, and defendants appeal. Affirmed.

John C. Townes, Jr., and Hines H. Baker, both of Houston, and H. B. Daviss, of Corsicana, for appellants.

J. S. Simkins, of Corsicana, for appellee.

VAUGHAN, J. Appellee, the owner of an oil, gas, and mineral lease, covering blocks 33, 34, and 40 of the subdivision of the W. W. Olsen lands in the Jos. Broyles one-third league in Navarro county, Tex., instituted this suit on the 31st day of July, 1923, against appellants Humble Pipe Line Company, a private corporation, owner of the fee-simple title to said blocks, and the Humble Oil & Refining Company, a private corporation, to recover damages alleged by appellee to have been sustained on account of certain acts and conduct on the part of appellants in appropriating the entire surface of said three blocks of land, whereby the further use thereof is rendered practically worthless to appellee for the purpose of exploring same for oil, gas, and other minerals, and the commercial value of said lease wholly destroyed, as well as the market value.

Appellee, in part, substantially alleged that on the 10th day of January, 1923, by mesne conveyance, he became, was, and is the owner and holder of the oil, gas, and mineral interests in and to said blocks 33, 34, and 40;

that subsequent to the acquisition of said mineral interest, appellants, or either of them, entered upon said blocks and adjoining territory thereto, and constructed a large earthen dam or dyke surrounding said blocks and other territory adjacent thereto, and have to a large extent submerged said blocks with water approximating in many places a depth of 5 or 6 feet, and have in part placed and laid across said blocks, pipe lines, and have placed thereon a number of boilers, and have built concrete footings and bases for said boilers, and have, in effect, constructed a pump station upon said ground; and that appellants, in an unreasonable manner, undertook to, and did, appropriate the entire surface of said blocks 33, 34, and 40; and that the placing of such dam or dyke about said property, and the placing of the pipe and other paraphernalia thereon, rendered the use of said blocks practically worthless to appellee, and made it practically impossible for him to develop or explore said lease, and said use now being made by appellants of the surface of said ground destroys the value of the use of said lease so held by appellee upon same, destroyed the commercial value thereof, and has resulted in great material damage and injury to appellee in the sum of $15,000.

Appellee further alleged that the acts of appellants were willful and deliberate and in wanton disregard of appellee's rights, and with the knowledge that the use of the surface so being made by them would destroy the value and use of same for oil, gas, and mineral purposes.

Appellants answered by general demurrer, special exceptions, general denial, and special answer, denying that their entry upon and use of the premises was willful and in disregard of appellee's rights, and alleged that the appellants were the owners in fee simple of the land and premises described in appellee's petition, subject only to the ownership of the outstanding mineral estate, and that as such owners they had the right to use and enjoy the surface of said premises in the manner in which they were using same, and that they had no intention of invading, and had not in fact invaded or injured, the rights of appellee, if any he had, in connection with said premises.

[1] Appellants, by bills of exception only, present the action of the trial court on special exceptions. In this condition of the record the assignments of error calling in question the action of the court on the special exceptions will not be considered, as the fact that the exceptions were presented to and ruled on by the court must be preserved by a judgment entry and not by a bill of exception. Meadows & Co., Inc., v. Turner (Tex. Civ. App.) 270 S. W. 899, and authorities cited.

[2] In view of the fact that of late this has not been an unusual error, we think it advisable to make the following observation, to wit: The disposition made of an exception is the pronouncement of the judgment of the court thereon, and, in case of a general exception, often becomes a final judgment. It is the pronouncement of a judge of a court upon any matter that makes for the determination of a cause before the court for judicial ascertainment that constitutes some form of judgment, and the record thereof is made by such pronouncement being incorporated in the minutes of the court, although it is only the order finally disposing of a suit that is referred to as the judgment entry. The office of a bill of exception is to make a record of proceedings had in the course of the trial of a cause that cannot be properly included in the minutes of the court in some form of judgment; in other words, to show proceedings of the court which do not otherwise appear of record. Owens v. Mo. Pac. Ry. Co., 67 Tex. 683, 4 S. W. 593; Firebaugh v. Ward, 51 Tex. 415. However, it was not intended that a bill of exception should be used for the purpose of supplanting or in any respect performing the service that belongs to the making of the record of proceedings had which are required to be incorporated in the minutes of the court. Gaines v. Salmon, 16 Tex. 312.

On March 5, 1924, a trial of this cause was had to a jury on five special issues. Of the issues submitted, it is only necessary in disposing of this appeal to consider the following issues and answers made thereto:

"What was the reasonable market value of the Wood lease for oil and gas purposes, without any water and without the pump station on said lease, during the period of time between July 24 and August 11, 1923? Answer: $100.

"What was the reasonable market value of said Wood's lease for oil and gas purposes, with the water and pump station on said lease, as shown by the evidence during the period of time between July 24 and August 11, 1923? Answer in dollars per acre. Answer: $40."

Judgment was rendered on the above findings of the jury, supplemented by the following uncontroverted facts, established by the evidence, to wit, that appellee owns the oil and gas lease on the property described in his petition; that he had the right to enter upon said property and develop same for oil and gas purposes; that appellant Humble Pipe Line Company owns the same tract of land by a fee-simple title, subject only to appellee's oil and gas lease; that some time prior to July 24, 1923, appellants caused a dyke or dam to be constructed, impounding water so as to cause same to overflow the surface of the tract of land covered by appellee's mineral lease to a depth of from 2½ to 6 feet, except about 2½ acres thereof; that the water so impounded was retained by appellants on said land from the 24th day of July to the 11th day of August,

1923; that said dyke or dam was built without the consent or knowledge of appellee; that on or about the 28th day of July, 1923, he protested to appellants against said water being permitted to remain on said land, and continued to protest until about the 10th day of August, 1923; the dyke or dam was cut on the 11th day of August, 1923, and the water submerging said land removed therefrom. The judgment so rendered was in favor of appellee against appellant for $900, with interest thereon at the rate of 6 per cent. per annum from date of judgment, and all costs of suit.

[3] As the measure of damages, the court only submitted to the jury the difference between the reasonable market value of appellee's lease without any water and the pump station on the land covered by said lease during the period of time between July 24 and August 11, 1923, and the reasonable market value of said lease during said period of time with the water and pump station on said land, and, on the findings of the jury as to such value, the judgment as to amount was predicated. Therefore, in view of the basis on which the judgment was rendered, all questions raised and now presented by assignments and propositions based on appellee's claim for damages growing out of the alleged acts of appellants, whereby appellee was prevented from developing his lease for oil and gas, will not be reviewed, as same will not be of any service in determining the propositions that alone must dispose of this appeal.

The trial court, over appellants' objection, permitted appellee to testify as follows:

"A party offered me $750 (per acre) for the lease if I would get the water drained off; that was about the 24th of July."

This was objected to on the ground (1) that there was no pleading to support the evidence, or any portion of it; (2) the appellee's cause of action was predicated upon alleged breach of the oil and gas lease and there was no evidence to show there was any contemplation on the part of the original lessors and lessees of any circumstances that might result in the unusual offer, or the result in damages that might flow from the construction and maintenance on said premises of the reservoir and pump station; and (3) there was no evidence offered to the effect that notice of such offer to purchase said lease was made at the time said original contract was entered into, or at the time of the alleged breach of the lease contract.

Appellee's cause of action is one for damages on account of acts and conduct alleged to have been committed by appellants, which, if true, amount to a tort. Townes on Torts, pp. 14, 15; Chicago, Rock Island & Gulf v. Duncan (Tex. Civ. App.) 273 S. W. 908 (opinion delivered April 25, 1925, not yet [officially] published). Therefore appellee's action is one of tort, notwithstanding the rights of the parties rest in contact with one representing the common source of title so as to make them privies in contract as to the making of the mineral lease, and that, under the conveyance of the fee to appellant Humble Pipe Line Company, said appellant and appellee occupy, to each other, the same position as that sustained by the parties to the original lease. Appellee sought by his cause of action to recover only such damages as would naturally flow from the acts alleged to have been committed, and that such results would flow from the commission of the acts alleged must have been within the knowledge of appellants is apparent from the case as made by the pleadings and evidence. Therefore, as appellee did not seek to recover special damages, evidence offered to establish a right to recover other than actual damages was inadmissible. However, that the evidence so admitted over appellants' objection was not considered by the jury for any purpose is very evident from the verdict rendered, and demonstrates that the jury, in arriving at its verdict, did not consider the testimony so objected to as being of any probative effect in arriving at the damages sustained by appellee.

[4] Appellee had testified, before making the statement objected to, that leases around his property and adjacent thereto had a market value in July and that he knew the market value; that some trades were on; that he had some trades on; that he was interested in knowing what his property was worth at that time; that the reasonable market value of his lease without the water on it, between the 15th and 22d of July, 1923, was from $250 to $700 per acre. The testimony objected to was to the effect that a conditional offer of $750 per acre had been made to him for his mineral lease, not that said sum of $750 was the market value. His testimony as to the market value being that the reasonable market value of his mineral lease, without the water on it, between the 15th and 22d of July, 1923, was from $250 to $700 per acre. The admission of this evidence we do not think was error, in the light of the conditions that necessarily must surround the value and establishing the value of property of the character involved, as same tended to corroborate the correctness of appellee's estimate of the market value of the property as testified to by him, and, viewed in its correspondence with the surroundings of the case, cannot be regarded as having been accepted by the jury as establishing the market value, but only in corroboration of the testimony of said witness as to such value. Reeves v. T. & P. Ry. Co., 11 Tex. Civ. App. 514, 32 S. W. 920. To the same effect, on general lines, is the holding in Garlington v. Ft. Worth & Denver, 34 Tex. Civ. App. 274, 78 S. W. 368, Galveston Wharf Co. v. John McYoung, 2 Willson, Civ. Cas.

(277 S.W.)

Ct. App. § 642, St. L. Iron M. & So. Ry. Co. v. Rogers, 49 Tex. Civ. App. 304, 108 S. W. 1027, from which latter case the following quotation is made as being on principle applicable to the instant case:

"The proposition is that: 'Evidence merely to the effect that cattle sold for a certain price without anything else being shown in addition to the actual sale does not tend to establish their market value at the time of sale.' If it should be conceded that this is a correct abstract proposition of law, yet there was no error in admitting the testimony complained of in this case, for the reason that in addition thereto there was other evidence of the market value of the cattle. It is true plaintiff's damages were not tu be determined from what the cattle actually sold for at the place of destination, but in view of the other evidence in the case we think the testimony objected to was admissible in connection therewith as a circumstance tending to show the market value of the cattle at that time in their then condition, from which such damages were to be determined."

Therefore we do not think that the admission of said testimony amounts to material error, and overrule appellee's proposition in reference to the admission of same.

[5, 6] J. A. Burk, a witness for appellee, testified that appellee's mineral lease on the three blocks in the Olsen tract was worth $500 an acre, net, on August 1, 1923. Appellants objected to this, on the ground that the witness had admitted in prior examination that he did not know what the market value of the leases in the vicinity of the Franco well was at the time in question, that he did not know whether there was a market at that time, and therefore that his answer was a mere conjecture or guess. This objection is more to the weight of the testimony than to its admissibility. In a general way, the witnesses qualified by showing that there was a market for mineral leases on land located in the vicinity of the land in question, and that he had a general knowledge of the value of such leases. The witness in this respect testified:

"I do not remember any sale of leases around the Wood lease the latter part of July or the 1st of August, and I am not positive that they were sold during that time. I know that at some time there was a market for the leases over there, and that some sold, but I would not say at what date. I think some leases sold over there about the time the Franco well was abandoned, or just before that time. I do not know of any positive sales, nor do I know what any leases sold for about that time in that locality."

Under this statement the witness was authorized under the law to express an opinion as to what such market value was, notwithstanding he was unable to state that he knew of any specific sales. It was shown that through discussion of the market value in reference to mineral leases the witness had sufficiently advised himself in reference thereto to express an opinion as to such values; this because market value in reference to undeveloped mineral leases must of a necessity rest more or less upon what is said by people generally about such values. Therefore, in matters of this kind, the law does not require that a witness shall be able to point out or testify to any specific sale in order to show market value, for, if it be shown that, through general discussion with others interested in the sale of such property, the witness has become generally advised as to the value of such form of property, he is then fully qualified to express the opinion thus formed by him as to the market value of such property.

The witness stated that he had been in the oil game about two or three years, trading and trafficking in leases in this oil field, knew where the Franco-Beeler well was located, who handled the drilling of the well, and that same was not abandoned until some time in August; that at that time he knew where the "play" was in this field; that the biggest buying and selling of leases was to the southwest; that they bought and sold all through the field; that at some time he knew there was a market value for the leases over there; that some sold, but he could not say at what date; that leases were selling pretty good, but around the last of July and first of August he did not know what the market value was for stuff over there at that time.

We therefore conclude that the court was not in error in overruling appellant's objection. This holding is warranted by the general rule announced in Wigmore on Evidence (2d Ed.) vol. 1, p. 1130, § 714, which is the conclusion reached by the learned author after reviewing the various grades and modes of information necessary to be shown to be within the knowledge of a witness called upon to testify to values commonly referred to as the test, depending upon the character of property, service, or thing, the value of which is called into question, to wit:

"That occasionally all specific limitations or tests are abandoned and the broader test adopted that any person having knowledge of or acquainted with the value may testify; the determination of the qualification thus being left open for each case. This is perhaps the most satisfactory and seasonable test, provided the application of it is left entirely to the discretion of the trial judge."

[7] It is contended that the court erred in overruling the objection of appellants to, and permitting, S. E. Smith, a witness for appellee, to testify as follows:

"I tried to buy some of the Olsen property from a man by the name of Mahone, but that was along in the summer, I believe in June some time; it was after the Smith well came in, and he wanted $300 for it. I did not buy it."

The grounds of objection urged are that the evidence was immaterial, irrelevant, and incompetent as proof of market value, being a single, isolated offer of sale as between other parties with reference to other lands. What we have said in disposing of appellants' proposition in reference to the admission of the testimony of appellee in reference to the offer of $750 per acre having been made to him for his mineral lease just as fittingly and well applies to this proposition. Therefore same is overruled.

Appellants, by appropriate proposition, challenged the ruling of the court in permitting, over appellants' objection, appellee to testify as follows: "I would say that the reasonable market value of my lease, without the water on it, between the 15th and 22d day of July, 1923, was $250 to $700 an acre; I would say that"—because appellee had not qualified to so testify by showing that he knew that there was a market value at the time and place in question, that he knew what the market value was at the time, and it was not permissible for him then to answer as to the market value by guess or conjecture. Appellee testified that he knew it was somewhere about the 10th day of August when the Franco well was finally abandoned at about 3,000 feet; that he went out to the Franco well on various occasions, had several leases in that vicinity; that he was dealing in the oil business and leases, stopped around the hotel lobbies every night for several months, and talked to people who were actively engaged in the oil business at that time, and that was what he based his conclusion on; that the leases around and adjacent to this property had a market value in July; that he knew that market value; that he had some trades on; that he was trying to follow developments in the oil field closely; that he talked to brokers and scouts of the oil companies and traders in general.

[8] Under the justly liberal rule laid down in Wigmore on Evidence, supra, we think the above evidence sufficient to show the qualification of appellee to testify what was, in his opinion, the market value of his mineral lease. Therefore appellants' objection in this respect is overruled.

In numerical order, appellants' tenth and eleventh propositions question the sufficiency of the evidence to support the finding of the jury in answer to questions Nos. 4 and 5 submitted in the charge of the court; therefore will be considered as presenting but one proposition.

The evidence bearing upon the reasonable market value of appellee's lease for oil and gas purposes, without the water and pump station on the land covered by said lease during the period of time between July 24 and August 11, 1923, is to the effect that said lease was during said period of time worth from $250 to $700 per acre. It is true it is largely speculative in effect, but it is based upon the observation of the witnesses of the dealings had in such character of property, the statements made by others likewise interested in ascertaining the prevailing concensus of opinion of those generally having to do with and concerned in transactions involving the barter, sale, and exchange of oil leases in the field of which appellee's mineral lease formed a part. Appellee testified that the reasonable market value of his lease without the water on it, between the 15th and 22d of July, 1923, was $250 to $700 per acre; that he had several opportunities to sell his lease without the water on it; that one party offered him $750 an acre for it if he would get the water drained off. This was about the 24th of July, right after the time he had tried to get appellants to drain the water off the land covered by his lease.

The witness S. E. Smith further testified that he was in the oil business, had drilled some small wells, and was in the brokerage and lease business, handling mineral leases, etc.; that he had kept up with the trend of development in this field, and had talked with drillers and other oil men around the Seaton and Main hotels; that he did not know of any actual transfer of property or leases in the southeast corner of the Broyles survey in the latter part of July, but thought there were several calls for, but did not make any deals himself or know of any transactions that were had in reference to such property.

The witness J. A. Burk, on the issue of value, testified as heretofore stated.

[9] This, we think sufficient evidence to sustain the findings of the jury in response to said issue No. 4.

[10] The answer to issue No. 5, to wit, that $40 per acre was the reasonable market value of said lease for oil and gas purposes with water and pump station on the land covered by said lease for the period of time between July 24 and August 11, 1923, is supported by evidence not cogent, it is true, but sufficient to require the submission of the issue, and, we think, to base the jury's verdict thereon. This conclusion is induced by the following testimony:

R. L. Wheeler, a witness for appellants, testified that he was familiar with the B. L. Smith No. 1, Irvine; that it came in on the 1st or 2d of July, making about ten thousand barrels per day for something like three weeks, and that it began to make basic sediment about the 22d or 24th of July, and ran that way for 10 or 15 days, getting worse all the time; that this well is about a mile or three-quarters of a mile from the southeast corner of the Olsen tract; that the Smith-Irvine well condemned the value of oil leases east of that point; that after this well came in he did not suppose any of the oil leases east of that point could have been sold for any value hardly, not to amount to anything, probably $100 an acre; that he

would not have paid $10 an acre for any of it.

The jury evidently based its verdict in answer to special issue No. 5 upon this evidence as showing that the value of appellee's lease with the water and other obstructions placed thereon by appellants during the period of time stated in the issue submitted was $40 per acre. The latitude of the testimony of this witness being from $1 to $100 per acre, and largely a matter of guess on his part, based upon his general information concerning the conditions then existing on the ground as well as knowledge of dealings had in reference to property of this character. The jury acted within its province in arriving at what they conceived to be the weight and effect to be given the testimony; and no doubt took into account, as they should have, all of the evidence before them bearing upon the value of appellee's mineral lease, and, aided by their knowledge of people in general and things in particular, were enabled to harmonize the wide divergence in the evidence so as to reach what, in their judgment, was a fair appraisal of such testimony as a basis for their verdict. Therefore the verdict is not without evidence in its support, and rests upon the conclusion of the jury properly drawn therefrom.

We overrule appellee's propositions 10 and 11.

Appellants' twelfth proposition challenges the correctness of the following charge as to the burden of proof:

"You are instructed that the burden of proof is on the plaintiff, L. J. Woods, to prove by a preponderance of the evidence that the defendants interfered with or prevented him from developing said property for oil and gas purposes, and that he was damaged thereby,"

—on the ground that same does not charge the jury that the burden is upon the appellee to establish by a preponderance of the evidence the amount of his damages. Appellants duly excepted and objected to the giving of said charge, on the grounds above stated, but did not present to the court a special charge requesting the submission of appellants' views of the law as expressed in said objection.

[11, 12] Conceding that the charge did not properly submit the burden of proof with reference to the amount of damages, nevertheless it was incumbent upon appellants in order to take advantage of this error, to have presented to the court a special charge properly presenting the law applicable thereto. This requirement was not met by appellants' timely objection to the charge; therefore they are not in position to complain of this alleged error. However, we are inclined to believe that, taking the charge as a whole, same properly placed upon appellee the burden of proving, not only that appellants committed the acts of trespass therein alleged, but that he had suffered damages on account

thereof as alleged and the amount of damages so suffered; therefore it was not necessary for the court to have singled out and expressly charged that the burden of proof was upon appellee to establish by a preponderance of the evidence the amount of damages, if any, he had sustained, certainly not unless so requested by properly prepared special charge. Am. Cotton Co. v. Collier, 30 Tex. Civ. App. 105, 69 S. W. 1021; Stooksbury v. Swan, 85 Tex. 565 (10), 22 S. W. 963; Frank v. Feinberg (Tex. Civ. App.) 256 S. W. 945 (1, 2).

Appellants' theory of the law is not in accord with the following instruction given by the court to the jury:

"You are instructed that by the term 'market value' is meant the price that the oil and gas lease owned by L. J. Woods would have sold for for cash or its equivalent between the dates of July 24, 1923, and August 11, 1923,"

—and duly excepted and objected to same on the ground that same does not instruct the jury that "market value" must be at the place where the lease is located.

[13] Appellants did not submit to the trial court a special charge or request a special issue covering this alleged defect. Therefore, even conceding that said charge is subject to the criticism made by appellants, yet this will furnish no grounds for reversal, since appellants did not attempt by special charge or requested issue to have the trial court correct such defective charge. Vernon's Sayles' Ann. Civ. St. 1914, art. 1985; Burnham & Co. v. Logan, 88 Tex. 1 (syl. 1) 29 S. W. 1067; G. H. & S. A. Ry. Co. v. Hubbard, 33 Tex. Civ. App. 343 (1), 76 S. W. 764.

[14, 15] In view of the manner in which the case was developed by the introduction of testimony by both parties anent market value, showing clearly that the inquiry in reference thereto was not confined to any particular place nor the evidence directed to an inquiry as to market value at any particular place, it is to be assumed that it was understood, both by the litigants and the court, that the inquiry was confined as to the market value of leases in the local or Corsicana-Powell oil field; therefore, the question of place not having been raised by the evidence nor by the pleadings, it certainly did not become the duty of the court to direct the jury's attention to any particular place in considering the question of market value, for "market value in the controlling market may always be shown whatever its distance." 16 Cyc. 1144. From this we conclude that the evidence offered was properly before the jury, to be considered in arriving at the question of value without reference to the location of the market or the particular oil field of which the lease in question formed a part, and without reference to the location of, or distance from, such market. Therefore it would have been error on the part of the trial court to have singled out

any particular place and directed the attention of the jury to it, so long as the evidence was confined to and bearing upon the question of the market value of the lease involved, as the value of this kind of property, from its very nature, the character of dealings involved therewith, is not confined to the locality of the property covered by the lease.

Appellants' fourteenth and fifteenth propositions present, in effect, but one issue, to wit, that appellee, as the owner of the lease upon appellants' land, only had the right to use so much of the surface as was reasonably necessary for the drilling and operating for oil and gas and for laying pipe lines, building tanks, power stations, and structures thereon to produce, save, and take care of said products, and, since the undisputed proof shows that the appellants, as the owners of the fee, did not deny or deprive appellee of this right, there was no breach of the lease contract by the appellants and no violation of appellee's rights, and the appellants were entitled to an instructed verdict. This contention is in the main based upon the following clauses, to wit: The granting clause in the mineral lease owned by appellee, which reads as follows:

"Have granted, demised, leased, and let and by these presents do grant, demise, lease, and let unto the said leases, for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, power stations, and structures thereon to produce, save, and take care of said products."

And the following clause contained in the deed executed by Olsen and wife to appellant the Humble Pipe Line Company, covering same land included in appellee's lease, together with other lands:

"Have granted, sold, and conveyed, and by these presents do grant, sell, and convey unto the Humble Pipe Line Company the following described land. * * *

"It is distinctly understood that this conveyance does not cover, but there is reserved, saved, and excepted to the grantors, their heirs and assigns, all the minerals in and under said land. Said minerals being expressly retained by the grantors, together with the right of the grantors, and their heirs, assigns, and legal representatives of ingress and egress, over and across and upon said land hereby conveyed at any and all times for the purpose of mining and developing said land for oil, coal, gas, and all other minerals, and of laying pipe lines and building tanks, towers, stations, and structures thereon to produce, save, and take care of such minerals; it being further understood and agreed that such mineral estate and rights hereby reserved, retained, and excepted shall apply, not only to existing oil and gas leases upon said land, but also to any subsequent mineral lease or leases which may be placed upon said land by the grantors, their heirs, successors, legal representatives, and assigns."

Appellants' position excludes the idea that there rested with appellee under the terms of his lease any right other than to explore the land covered by his lease for oil, gas, and other minerals, and that there did not exist the right to use same for the purpose of barter, sale, or exchange, and that, so long as the use of the surface on the part of appellants did not interfere with the use of said surface by appellee for mining and operating for oil and gas, and of laying pipe lines and of building tanks, etc., regardless of the character of the use of the surface by appellants, although it should result for the time being in destroying the commercial value of the lease or its market value, appellee could not complain because appellants were within their rights, as such use did not in fact interfere with the use by appellee of the surface for the purpose of operating for oil and gas as stated in said lease. This perhaps would be true if the use that appellants so made of the surface was reasonable or within the contemplation of the parties to the original mineral lease, viz. W. W. Olsen and wife, lessors (the grantors of appellant Humble Pipe Line Company) W. H. Warren, R. K. Blackshear, and Homer McLeod, lessees (the remote lessors of appellee). However, as shown by said original lease, the use made by appellants, and which is alleged by appellee to be the cause of the injury resulting to his mineral lease and thereby causing him to sustain damages as alleged, was not within the contemplation of the parties at the time of the execution of said lease. Appellee and appellant Humble Pipe Line Company stand in the same position towards each other as that occupied by the parties to the original lease; their rights are identical, and, regardless of the purpose for which appellant Humble Pipe Line Company acquired title to the absolute fee, and right to use the surface subject only to the rights of the mineral lease held by appellee, the right of appellants to use said surface was not enlarged or the rights of appellee impaired or restricted thereby. Therefore any unauthorized or unwarranted use on the part of appellants of the surface, though in line with the purpose for which appellants acquired the title to the surface, and which use did not prevent appellee from mining and operating for oil and gas, etc., under his mineral lease on the land covered thereby, would not relieve appellants of liability for damages resulting to appellee on account of such unauthorized or unwarranted use, whereby appellee's mineral lease was injured and he caused to suffer damage on account of the depreciation of its market value as an article of commerce. That it was not contemplated that an unauthorized or unwarranted use, or such use as would destroy the commercial value of the mineral lease, should be made, may be assumed from the express authority conferred by the following terms of the original lease:

"If the estate of either party hereto is assigned, and the privilege of assigning in whole

or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors. administrators, successors, or assigns; but no change in the ownership of the land or assignments of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer of assignment or a true copy thereof; and it is hereby agreed that, in the event this lease shall be assigned as to a part, or as to parts of the above-described lands, and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rents due from him, or them, such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said lands upon which the said lessee or any assignee thereof shall make due payment of said rental. * * * "

[16] The clause, "if the estate of either party hereto is assigned * * * and the privilege of assigning in whole or in part is expressly allowed," while not in fact enlarging the power and authority of the lessee to part with the estate secured by the mineral lease, either by barter, sale, or exchange, yet it clearly reveals that it was within the contemplation of the parties that there passed with the lease other rights than the mere right to mine for oil, gas, and other minerals, to wit, the right to handle it as an investment and the recognition that said mineral lease had other than a value depending upon the result of development, to wit, a commercial value determinable by the prices placed by owners on such property and paid by purchasers thereof. It was certainly not within the contemplation of the parties to the original mineral lease that the land covered by the lease owned and held by appellee should be submerged with water by building a dam or dyke so as to cover same to a depth ranging from 2½ to 6 feet. Therefore such use, not only as affecting the right of mining and operating for oil and gas, but as injuring or destroying the commercial value of such lease, was unwarranted and unauthorized, in fact, was a wrongful invasion of the rights of appellee, amounting to a tort, for which appellee is entitled to full indemnity.

[17, 18] The court's charge was very favorable to appellants in the latitude of time within which the jury was allowed to fix the amount of damages sustained by appellee. The correct measure of damages being the difference between the reasonable market value of appellee's lease for any lawful purpose to which he might put it, immediately before the acts and conduct complained of by appellee, and such value immediately thereafter. To sustain appellants' position would be but to confer upon them, the alleged wrongdoers, the right to limit or restrict the appellee, the injured party, in the lawful use he may make of his property, viz. the lawful purposes to which he had a right to apply it. This is not, or at least should not be, the law. Appellee acquired, undoubtedly, a fixed property right as the owner of the mineral

lease and, as such owner, had the lawful right to use the surface for the purpose of mining and operating for oil and gas, etc., as per the above provision of said original lease, and, in addition thereto, the right to dispose of his property as an article of commerce by barter, sale or exchange. Washington Ice Co. v. Webster, 68 Me. 449; Phil. & R. R. Co. v. Getz et al., 113 Pa. 214, 6 A. 356.

[19, 20] The fact that the value may not only be fleeting, indefinite, and hard to ascertain, and its duration a matter of rank speculation and often depending more upon the nerve of the speculator investor than good judgment, can make no difference, for, alas, the question is, whether or not that which is recognized by law as property has a value, and that a mineral lease, even in undeveloped territory, is recognized by law as being property of ascertainable market value is not open for discussion. The existence of a mineral lease creates a property right; and, in an action for damages thereto, value may be predicated, for ascertaining the measure of recovery, on the production and value of minerals or the market value of the mineral lease as an article of commerce. This is true, although a lease conveys no actual interest in the land but only creates a right to use the land for a certain purpose. It is the right to search for, as well as the mineral that may be produced by, development, that constitutes a mineral lease property. It cannot be said that it is the purpose of the Constitution to protect one class of property to the exclusion of another, but, rather it must be interpreted as extending the benefits of its provisions to all interests in the form of property rights growing out of or connected with property having a substantial existence, so as to secure to the owner of such rights of property, not only protection in the possession thereof, but in the enjoyment of whatever its value may be, free from the unwarranted invasion or interference of another.

Therefore we hold that, even to the extent of its market value as an article of commerce, speculative as it may be, appellee is entitled to be protected against the invasion of his lease by the unwarranted and unauthorized acts of appellants which resulted in an appropriation of the surface to such an extent as to greatly depreciate the market value of appellee's lease as an article of sale, barter, and exchange in the markets for such property, and that appellee is entitled to recover as his damages sustained on account of the acts of appellants, the difference between the market value of his mineral lease as an article of commerce immediately before such acts and conduct of appellants as alleged, and the value of said lease immediately thereafter. Dallas County v. Hart Bros. (Tex. Civ. App.) 271 S. W. 408.

While the record is not free from error, yet we have failed to find any that would, in

our opinion, justify the case being reversed; the record showing as a whole that a just conclusion of the litigation has been reached. Therefore the judgment of the lower court will be affirmed.

Affirmed.

LOONEY, J. (dissenting). I find myself out of harmony with the majority as to the law of this case, and now state the reasons that have impelled me to dissent.

It is evident the majority decided against appellants on the idea that the use made of the land (that is to say, the erection of the pumping plant and the reservoir) was unauthorized, illegal, and injured the leasehold interest of appellee, diminished its value, and caused the damage for which recovery was permitted.

This idea is clearly shown by the following excerpt from the majority opinion:

"It was certainly not within the contemplation of the parties to the original mineral lease that the land covered by the lease owned and held by appellee should be submerged with water by building a dam or dyke so as to cover same to a depth ranging from 2½ to 6 feet. Therefore such use, not only as affecting the right of. mining and operating for oil and gas, but as injuring or damaging the commercial value of such lease, was unauthorized and unwarranted, in fact, was a wrongful invasion of the rights of appellee, amounting to a tort, for which appellee is entitled to full indemnity."

To this doctrine I cannot assent.

Appellant Humble Pipe Line Company, was the owner of the fee-simple title to the land in question and, as such, had the legal right to use the surface in any way and for any purpose that did not materially interfere with the right of appellee under his lease; this being the right to mine for oil and gas, and to lay such pipe lines and erect such buildings, tanks, power stations, and structures as were necessary to produce the minerals and to save and take care of the same. The right of appellee to the use of the surface was in the nature of an easement; that is, the right of ingress and egress, the right to possess and use such parts of the surface as were reasonably necessary to accomplish the purposes for which the land was leased.

The respective rights of a lessor and lessee in lands leased for mineral purposes was defined by the Supreme Court of Oklahoma in the case of Sanders v. Davis, 79 Okl. 253, 192 P. 694, as follows:

"The courts of this country have frequently been called upon to determine the respective rights of the lessor and lessee in oil and gas mining leases similar to the one in the instant case, and it has been held that under such lease contracts the lessee has the right to possession of such parts of the surface of the land covered by the lease as may be reasonably necessary for the development and exploration of the leased premises for oil and gas, or what-

ever mineral right may be covered by the lease, and the lessor has a right to possession of all the surface not reasonably necessary in the. operation and exploration of such property by the lessee, and that both rights of parties will be protected by the injunctive power of the courts."

The same court, in Rennie v. Red Star Oil Co., 78 Okl. 209, 190 P. 392, on the same question, made the following announcement:

"Under an oil and gas lease the possession of the leased premises by the lessor and lessee is what might be termed a concurrent possession; that is to say, the lessee is entitled to enter upon the land leased and entitled to the possession of such parts and portions thereof necessary for developing the premises for oil and gas under the terms of the lease and to do the things necessary to make the operation successful."

To the same effect, see Thornton on Oil and Gas (3d Ed.) vol. 2, § 858; Imperial Elkhorn Coal Co. v. Webb, 190 Ky. 41, 225 S. W. 1077, 1078.

In the case of Westmoreland Gas Co. v. De Witt, 130 Pa. 235, 18 A. 724, 5 L. R. A., 731, the Supreme Court of Pennsylvania, defining the rights of a lessee under a mineral lease, said:

"Complainants' right in the surface of the land under the lease was rather in the nature of an easement of entry and examination, with the right of possession arising where a particular place of operation should be selected, and the easement of ingress, egress, storage, transportation, etc., during the continuance of the operation. The real subject of possession to which complainant was entitled under the lease was the gas or oil contained in, or obtainable through, the land."

In view of these authorities, and many others to the same effect that could be cited, I am of the opinion that appellant pipe line company, as the owner of the fee, had the unquestioned legal right to erect the reservoir and pumping station, and that it owed appellee no duty until it was informed by him on July 24, 1923, that it was his purpose to commence the drilling of a well on the land.

Appellee brought suit and was permitted to recover damages for injury to his leasehold interest caused by the erection of the reservoir and the pumping station by appellants. His suit was not on the idea that, after serving notice of his intention to drill, he was prevented, delayed, or frustrated, or that the drilling operations were rendered more expensive by reason of any conduct on the part of appellants that supervened after the serving of the notice. He did not seek the recovery of any such damages.

Must the owner of the fee maintain the surface in status quo and stand at attention during the existence of the lease, or else improve and use his land as he sees fit, at the

risk of being mulched in damages at the suit of a lessee? I think not. To so hold would be to absolutely subordinate the rights of the owner of the fee in regard to the use of the surface to the rights of the owner of the mineral lease, whose right to use the same is merely incidental to the exercise of its right to obtain minerals from the land.

If it is true, as held by the majority, that the use made of the land by appellants prior to being notified by appellee that he intended to drill, constituted an invasion of his rights and furnished grounds for the recovery of damages, then it must follow that any use that the owner of the fee may see fit to make of his land during the existence of an oil or mineral lease would constitute a potential injury to the leasehold and furnish grounds for an action for damages. This has never been declared to be the law in any jurisdiction so far as I have been able to ascertain; it ought not to be the law, and, in my opinion, is not the law.

There is another reason, in my opinion, that forbids recovery by appellee in the manner and form in which the suit was brought; that is, even if it could be said, as a matter of law, as was said by the majority, that the building of the reservoir and the pumping station on the land by the owner of the surface violated the legal rights of appellee and gave him a cause of action, still the damages that were sought and proven, and for which recovery was obtained, were special in nature, and not such as would naturally and probably result from the breach of the obvious purposes of the contract.

The existence of the pumping plant and reservoir on the land did not destroy any of its mineral wealth. About all that could be said is that, by reason of their presence on the land, appellee would probably be delayed in drilling, that the cost of drilling might be increased, and doubtless other elements of general damages could be mentioned, but surely it was not within the contemplation of the parties when the contract was entered into that, at any juncture, when the lessee might exercise his option to drill, the lease for commercial purposes might possess a fictitious value, influenced by the drilling of another well by other parties in the vicinity, and that such use of the land by the owner of the surface would lessen its market value for trading purposes.

At the time appellee gave notice of his purpose to commence a well on the land, he manifested no intention or desire to sell the lease, nor were appellants apprised of the fact that he had had an offer from any one to purchase, nor did he complain that the use then being made of the land would or might result in diminishing the market value of the lease for trading purposes, or that the same would or might defeat a profitable sale. He simply gave notice that it was his intention to commence the drilling of a well, and, in that connection, demanded that the reservoir be drained.

Under my view of the law, as applied to the nature of this suit, and to the facts of the case, appellee was not entitled to recover either general or special damages, but, if entitled to recover at all, was only entitled, under the undisputed facts, to recover damages general in nature such as would naturally and probably result from the acts complained of. My position on this proposition is justified by the rule announced in 8 R. C. A., subject "Damages," § 27, as follows:

"In order to recover special damages under this rule, however, it must appear that at the time of the making of the contract the defendant had reasonable notice of the special conditions rendering such damages the natural and probable result of such breach, otherwise the damages recoverable will be limited to those flowing from the ordinary and obvious purposes of the contract. The damages resulting by reason of their existence are disallowed in such case, not because they are uncertain, nor because they are consequential and remote, but because they cannot be fairly considered to have been within the contemplation of the parties when the contract was made."

The same doctrine is announced in 17 C. J. p. 746, as follows:

"Damages arising out of the special circumstances surrounding the contract and different from those which would naturally and probably flow from the breach of such contract may be recovered, where it is shown that, at the time of making the contract, the defaulting party had knowledge of such special circumstances. In the absence of proof of the knowledge of such special circumstances by the defaulting party at the time the contract is entered into, only the amount which would arise generally, and in the great multitude of cases not affected by any special circumstances by such a breach of contract, may be recovered."

To the same effect, see Jones v. George, 61 Tex. 354, 48 Am. Rep. 280.

Therefore I am of the opinion that the judgment of the trial court in this case should have been reversed, and judgment rendered in this court in favor of appellants.